**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tiffany Pulido, | No. CV-22-01704-PHX-DWL |
| Plaintiff | **ORDER** |
| v. | |
| Desert Platinum Properties, LLC; Jay Macklin; and Michelle Macklin | |
| Defendants. | |

Tiffany Pulido ("Plaintiff") briefly worked as a transaction coordinator at Desert Platinum Properties, LLC, which operates under the trade name Platinum Living Real Estate ("PLR"). In this action, Plaintiff has sued PLR and its owners Jay and Michelle Macklin (collectively, "Defendants"). Plaintiff contends she was misclassified as an independent contractor and seeks to recover the wages and overtime compensation to which she would have been entitled under federal and Arizona law if classified as an employee. Defendants contend that Plaintiff was properly classified as an independent contractor.

Now pending before the Court are the parties' cross-motions for summary judgment. (Docs. 23, 24.) For the reasons that follow, both motions are denied.

**BACKGROUND**

I.  Undisputed Background Facts

PLR is a real estate brokerage firm. (Doc. 24-2 at 3.) Plaintiff is a licensed real estate agent and broker. (Doc. 22 ¶ 3.) Although Plaintiff briefly "had her license placed

with" PLR (*id.* ¶ 4), Plaintiff's work as a real estate agent is not at issue here. Instead, this action concerns Plaintiff's work for PLR as a transaction coordinator, or "TC."

On April 5, 2022, Plaintiff received and signed an offer letter for a TC position with PLR. (Doc. 24-4 ["[PLR] is pleased to offer you the position of the company's lead Transaction Coordinator (TC) with an immediate start date."].) The offer letter stated that "[t]his position will be an Independent Contractor position with future growth opportunities." (*Id.*)

The role of a TC is to assist a real estate agent with the paperwork associated with a real estate transaction, which allows the agent to spend more time getting and closing deals. (Doc. 23-1 ¶ 7.) When an agent utilizes a TC to provide assistance with a particular transaction, the agent pays a fee to the TC that is taken out of the agent's commission. (*Id.* ¶ 26.) Under Arizona law, a TC can only provide TC services to agents associated with the same brokerage firm with which the TC is associated. (Doc. 24-6 at 7.) Thus, Plaintiff could only perform TC services for agents associated with PLR. (*Id.*)

Plaintiff did not receive an hourly wage from PLR for her work as a TC. Instead, Plaintiff was to receive 75% of the fees that her work as a TC generated, with PLR retaining the other 25%. (Doc. 23-1 ¶ 27. *See also* Doc. 24-4 [offer letter, explaining that "[y]ou will have access to all PLR agents and TC fees collected will be split with PLR at 25%"].)

PLR sometimes, but not always, required agents to use a TC. The distinction turned on whether a particular transaction resulted from a "lead" that had been generated by PLR. In transactions that resulted from a lead, PLR required the agent to use the services of one of its TCs. (Doc. 23-1 ¶ 13.) In contrast, in transactions that did not result from a lead, "the PLR agent may use the services of the TC or they may elect to handle those transactions themselves or with their administrative team. In other words, on non-lead transactions, the PLR agent is not required to use the TC." (*Id.* ¶¶ 16-17.)

On April 7, 2022, Plaintiff "began her 'onboarding' process with PLR." (Doc. 22 ¶ 8.) PLR did not provide Plaintiff with an individual office, but she sometimes worked at PLR's facility in an open area known as the "bull pen." (Doc. 23-1 at 39-42, 103 ¶ 8.)

"Not long after PLR announced that Plaintiff was available to provide TC services to PLR's agents, PLR began receiving negative comments and concerns about Plaintiff. One such agent . . . vowed to never use [Plaintiff's] TC services because of her unprofessionalism. Another agent noticed unprofessional conduct posted on Plaintiff's social media. The few agents who did work with [Plaintiff] complained of her responsiveness, professionalism, and work product." (Doc. 23-2 ¶ 18. *See also* Doc. 24-3 at 15-17 [Rule 30(b)(6) testimony of Michelle Malkin regarding complaints].)

On April 29, 2022, Plaintiff was informed that PLR no longer required her TC services. (Doc. 23-1 at 82.) Plaintiff did not perform any TC services for PLR after that date. (Doc. 22 ¶ 10.)

During her brief tenure as a TC for PLR, Plaintiff worked on 13-17 transactions. (Doc. 23-1 at 21, 23-24.) However, "[m]any of these transactions were in process when [Plaintiff] came on board," and Plaintiff never "start[ed] and complete[d]" an individual transaction. (*Id.*) Additionally, none of the transactions on which Plaintiff worked resulted from a lead that PLR had provided to the agent. (Doc. 23-1 ¶ 19.) Plaintiff ultimately received fees for only two of the transactions on which she worked, with those fees totaling $393.75. (Doc. 24-6 at 8.) In several other instances, "the agents were so upset because their files were such a mess they didn't want to pay the TC fees and finished out their own files." (Doc. 24-3 at 16.)

II.     Procedural History

On October 6, 2022, Plaintiff initiated this action by filing the complaint. (Doc. 1.) The complaint asserts the following four claims: (1) failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"); (2) failure to pay minimum wages in violation of the FLSA; (3) failure to pay minimum wages in violation of the Arizona Minimum Wage Act ("AMWA"); and (4) failure to pay wages due and owing in violation of the Arizona Wage Act ("AWA"). (*Id.* ¶¶ 109-137.)

On September 8, 2023, Defendants moved for summary judgment. (Doc. 23.) That same day, Plaintiff moved for partial summary judgment on liability. (Doc. 24.)

Both motions are now fully briefed. (Docs. 27-30.) Nobody requested oral argument.

**DISCUSSION**

I. <u>Legal Standard</u>

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Id.* at 1102-03. But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to produce evidence to support its claim or defense. *Id.* at 1103. The nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks and emphasis omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks omitted).

II.     Defendants' Motion For Summary Judgment

    A.     **Background Law**

In *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748 (9th Cir. 1979), the Ninth Circuit identified the following six non-exclusive factors as "useful in distinguishing employees from independent contractors for purposes of social legislation such as the FLSA": (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *Id.* at 754.

B. **The Parties' Arguments**

Defendants argue that "Plaintiff was an [Independent Contractor], not an employee" based on the *Driscoll* factors. (Doc. 23 at 8.) More specifically, as for the first *Driscoll* factor, Defendants contend that PLR did not maintain an attendance log, track Plaintiff's hours, mandate a minimum number of hours Plaintiff had to spend doing TC work, require Plaintiff to be in the office, supply Plaintiff with the "vast majority" of the equipment she used, or mandate preapproval of Plaintiff's marketing materials and also allowed Plaintiff to set her own TC prices and to decline to service particular PLR agents. (*Id.* at 9-13.) Defendants also contend that, although Plaintiff was only allowed to work with PLR agents, this was a restriction required by Arizona law. (*Id.* at 12.) As for the second *Driscoll* factor, Defendants argue that "Plaintiff's opportunity for profit or loss depended entirely on her ability to convince agents to utilize her TC services and to do the work for those agents." (*Id.* at 14.) As for the third *Driscoll* factor, Defendants note that Plaintiff was responsible for providing her own computer, phone, internet, and office supplies and argue that Plaintiff's assertion that PLR covered certain of her "startup/onboarding expenses" is factually unsupported. (*Id.*) As for the fourth *Driscoll* factor, Defendants note that Plaintiff was required by law to be "a licensed real estate professional, which requires specialized education and licensure." (*Id.* at 14-15.) As for the fifth *Driscoll* factor, Defendants note that the independent-contractor agreement did not have a fixed end date and that Plaintiff ultimately worked as a TC for only a few weeks before being terminated. (*Id.* at 15.) As for the sixth *Driscoll* factor, Defendants contend that Plaintiff's work was "not an integral part of PLR's business" in part because the use of a TC is voluntary on behalf of the agent during a real estate transaction. (*Id.* at 15-16.) Defendants also assert that "Plaintiff's testimony is largely unsupported by the evidence and, in some instances, is inconsistent, rendering questionable her credibility" and contend that their requests for admissions should be "deemed admitted" because Plaintiff made an untimely extension request and they only granted that request as to "remaining outstanding discovery responses." (*Id.* at 4-8, emphasis omitted). Finally, Defendants state in their conclusion

that "based on the foregoing, which includes numerous instances of untruthful and inconsistent statements by Plaintiff, it is clear that Plaintiff and her counsel have multiplied this proceeding unreasonably and vexatiously and should, therefore, be required to pay Defendants' costs, expenses, and attorneys' fees reasonably incurred because of such conduct" pursuant to 28 U.S.C. § 1927. (*Id.* at 16-17, internal quotation marks omitted.)

Plaintiff responds that "the reality is that Defendants exercised control over Plaintiff's work [and] Plaintiff was economically dependent upon Defendants, such that a genuine issue of material fact remains as to her 'employee' status." (Doc. 28 at 1.) Plaintiff also notes that, in relation to her state-law claims, Defendants bear the burden of proving independent-contractor status by clear and convincing evidence. (*Id.* at 5.) Turning to the first *Driscoll* factor, Plaintiff argues that it favors her (or at least presents a jury question) because Defendants controlled the prices she charged, expected her to be available to agents at all times, expected her to work from PLR's facility, promised to provide her with an office and computer, provided her with limited access to PLR's processing software, restricted her to working with only PLR-affiliated agents, required her to hold herself out as a PLR employee in marketing materials, and once asked her to perform TC work for free as a "favor" to an agent. (*Id.* at 6-10.) Plaintiff also notes that because she was PLR's only TC during the relevant period, and PLR required its agents to use one of PLR's TCs on any transaction generated from a lead, she was effectively required to provide service to such agents (even though no such transactions happened to occur during her tenure). (*Id.* at 9.) As for the second *Driscoll* factor, Plaintiff argues that it favors her or at least presents a jury question because her incentives were similar to those of an hourly worker and because Defendants controlled her ability to hire an assistant. (*Id.* at 10-11.) As for the third *Driscoll* factor, Plaintiff argues that it "considers not what Defendants provided to Plaintiff, but what Plaintiff invested in her alleged business compared to Defendants' investment in their business" and thus favors her because "Plaintiff did not make any large capital expenditures and her investment was minimal in comparison to Defendants' large capital expenditures for office space, utilities, and software, which were all available to

Plaintiff to use." (*Id.* at 11-12.) As for the fourth *Driscoll* factor, Plaintiff argues that although she happened to hold a real estate license, "she was not using these skills in an independent way" because the role of TC simply required her to perform data entry and provide paperwork assistance. (*Id.* at 12-13.) As for the fifth *Driscoll* factor, Plaintiff argues that the actual duration of her relationship with PLR is not what matters—instead, what matters is that she was hired for an indefinite duration. (*Id.* at 13-14.) As for the sixth *Driscoll* factor, Plaintiff argues that it favors her because it "considers whether the work performed is a necessary component of the business, not whether a single individual is an indispensable worker," and thus it is irrelevant that agents could choose not to utilize her for a particular transaction. (*Id.* at 14.) Finally, Plaintiff argues that "[t]he Court does not make credibility determinations on summary judgment," that her "Responses to Defendants' Requests for Admission were not late, and even if they were, they should not be deemed admitted," and that "[t]he Court should deny Defendant' unsupported request for § 1927 sanctions." (*Id.* at 14-17.)

In reply, Defendants contend in relation to the first *Driscoll* factor that Plaintiff's arguments rely largely on her own testimony, which is contradicted by other evidence. (Doc. 29 at 2-4.) In particular, Defendants take issue with Plaintiff's assertions that Defendants set her prices, required her to work all hours, and required her to work in the office. (*Id.*) Defendants also contend that many of Plaintiff's arguments are premised on misunderstandings of the regulatory requirements of the real estate industry, which require brokers to perform certain forms of supervision. (*Id.* at 4.) As for the second and third *Driscoll* factors, Defendants largely reiterate their earlier arguments. (*Id.* at 4-5.) As for the fourth *Driscoll* factor, Defendants accuse Plaintiff of "downplay[ing] the skill, education, and licensure necessary" to perform TC work. (*Id.* at 5-6.) As for the fifth *Driscoll* factor, Defendants accuse Plaintiff of "misstat[ing] Ms. Macklin's testimony." (*Id.* at 6.) As for the sixth *Driscoll* factor, Defendants argue that the voluntary nature of Plaintiff's services demonstrates that they were not integral to PLR's business. (*Id.* at 6.) Defendants conclude: "The economic reality is Plaintiff was in business for herself.

- 8 -

1  Plaintiff set her own prices and schedule.  Plaintiff utilized her own equipment and relied
2  on her license and experience in an independent way.  Plaintiff could solicit business from
3  Defendants' 100 affiliated real estate agents and choose who to work for (or not).  Plaintiff
4  was compensated for her work on discrete projects, not her time." (*Id.* at 6-7.)

### C. Analysis

Under the FLSA, "the determination of the [employment] relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).  "Employees" in the FLSA context are "those who as a matter of economic reality are dependent upon the business to which they render service." *Driscoll Strawberry Assocs.,* 603 F.2d at 754 (cleaned up). *See also Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) ("[T]he economic reality rather than technical concepts is . . . the test of employment . . . .") (cleaned up).  As noted, to assess this economic reality, courts weigh and balance the six non-exhaustive *Driscoll* factors.  However, "[n]either the presence nor the absence of any individual factor is determinative." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981).  The same standards apply when evaluating Plaintiff's state-law claims, although Defendants must satisfy a clear-and-convincing standard of proof in that context. A.R.S. § 23-362(D) ("[W]hether a person is an independent contractor or an employee shall be determined according to the standards of the federal fair labor standards act, but the burden of proof shall be upon the party for whom the work is performed to show independent contractor status by clear and convincing evidence.").

At the outset, there is no merit to Defendants' argument that Plaintiff must be deemed to have "admitted" that she was an independent contractor because she failed to make a timely request for an extension of the deadline to respond to Defendants' request for admission on that topic.  The relevant background is as follows.  On March 9, 2023, Plaintiff's counsel wrote the following to Defendants' counsel: "I have our discovery responses calendared as due Monday March 13.  I am requesting a two week[] extension to complete our responses.  I will of course be happy to extend the same courtesy to you in

responding to our requests. Please let me know if you are willing to grant the extension." (Doc. 23-3 at 26.) The following day, Defendants' counsel responded: "We actually had your responses calendared for the 8th. You may have a two week extension." (*Id.*) Any reasonable person would view this as an unqualified agreement to extend the response deadline by two weeks as permitted by Rule 36(a)(3), and not—as Defendants now seek to portray it—some partial agreement only to extend the deadline as "to the *remaining* outstanding discovery responses." (Doc. 23 at 8.) Such gotcha litigation tactics are not flattering and should not be encouraged. At any rate, even assuming Plaintiff's response was one day late, the Court would exercise its discretion to permit the late response. *French v. United States*, 416 F.2d 1149, 1152 (9th Cir. 1968) ("A trial judge has discretion to permit a late response to a request for admissions made pursuant to [Rule 36], and thus relieve a party of apparent default."); *Drs. Med. Ctr. of Modesto, Inc. v. Principal Life Ins. Co.*, 2011 WL 831421, *3 (E.D. Cal. 2011) ("Despite the self-executing nature of Rule 36 . . . the Ninth Circuit has long recognized the district court's discretion to permit late responses to requests for admission.").

Equally unavailing is Defendants' seeming contention (Doc. 23 at 4-8) that summary judgment should be granted in their favor because Plaintiff's testimony is categorically incredible. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Of course, the Court need not credit any individual factual assertion by Plaintiff if it is "blatantly contradicted by the record . . . or incredible as a matter of law," *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1254 (7th Cir. 2013), but the Court cannot go further at this stage of the case and categorically discount Plaintiff's testimony on *all* factually disputed points simply because her testimony on certain points has been shown to be inaccurate.

Turning to the merits, although much of the evidence is undisputed, the Court

concludes there are still enough disputed facts, as well as disputed inferences arising from undisputed facts, to render summary judgment inappropriate. *See, e.g., Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) ("Judge Easterbrook has keenly observed in a case under the Fair Labor Standards Act that if we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.") (cleaned up); *Gillard v. Good Earth Power AZ LLC*, 2019 WL 1280946, *7 (D. Ariz. 2019) ("The Court finds that material disputes of fact and inferences to be drawn from the facts exist concerning the [*Driscoll*] employee/contractor factors that preclude summary judgment.").

For example, as for the first *Driscoll* factor (PLR's right to control the manner in which Plaintiff's work was performed), even though certain undisputed aspects of the parties' relationship (such as Defendants' decision not to track Plaintiff's hours or require her to be in the office) may be viewed as demonstrating a lack of control, and although Plaintiff's subjective belief that she was unable to set her own prices is difficult to reconcile with the evidence that Plaintiff simply asked Michelle Macklin about the historical prices that TCs had charged because Plaintiff wanted to select rates that were consistent with past practice (Doc. 23-3 [Plaintiff: "What is the current fee they have been charging? . . . I just wanna make sure that it's an easy transition. Especially with the fees and stuff."]), this is a unique case in that Plaintiff was effectively required to perform TC services only for agents associated with PLR. Although Defendants argue this was the result of legal and regulatory requirements, rather than a policy choice, it still represented Plaintiff's economic reality. Additionally, although Plaintiff didn't, in her brief time with PLR, happen to work on any transactions arising from leads generated by PLR, a reasonable factfinder could conclude that she was obligated to work on such transactions, given that PLR required its agents to use one of PLR's TCs in transactions arising from leads and Plaintiff was PLR's only TC at the time. These are not typical aspects of an independent-

contractor relationship. *Donovan*, 656 F.2d at 1372 (noting that "true independent contractors . . . generally offer their services to different employers"). *Cf. Narayan*, 616 F.3d at 902 (reversing grant of summary judgment in favor of putative employer, where the disputed issue was whether drivers qualified as employees or independent contractors "under California's multi-faceted test of employment," in part because the drivers "drove exclusively for EGL during their period of employment, and there is at least a material issue of fact as to whether they could have driven for other delivery companies"). Due to these unique features, a reasonable factfinder could conclude that Plaintiff was "as a matter of economic reality . . . dependent upon the business to which [she] render[ed] service." *Driscoll Strawberry Assocs.*, 603 F.2d at 754.

Given this backdrop, it is unnecessary to wade into all of the parties' discrete factual disputes over certain other considerations that bear on the first *Driscoll* factor. The bottom line is that when all genuine factual disputes and reasonable inferences are resolved in Plaintiff's favor, a factfinder could view the first *Driscoll* factor, which is perhaps the most important factor, *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 884 (9th Cir. 1980) ("The extent of the employer's right to control the means and manner of the worker's performance is a primary factor."), as cutting in Plaintiff's favor. This is particularly true in relation to Plaintiff's state-law claims, as to which Defendants face a heightened burden of proof.

As for the second *Driscoll* factor (the alleged employee's opportunity for profit or loss depending upon managerial skill), even though much of Plaintiff's ability to earn a profit hinged on her ability to persuade agents to hire her to perform TC services on a transaction (in which case she would keep 75% of the resulting fees), a reasonable factfinder could also conclude that Plaintiff was effectively guaranteed to be selected to perform TC services on the subset of transactions arising from leads. Thus, even if the second *Driscoll* factor could be viewed in isolation as favoring Defendants' position, it does not cut in their favor so decisively as to compel the entry of summary judgment in their favor, particularly where it is counterbalanced by other factors that are more mixed

or can be reasonably viewed as supporting Plaintiff's position. *Donovan*, 656 F.2d at 1370 ("Neither the presence nor the absence of any individual factor is determinative.").

As for the third *Driscoll* factor (the alleged employee's investment in equipment or materials required for her task, or her employment of helpers), although certain facts support Defendants' position, others do not. For example, it is undisputed that Defendants provided Plaintiff with a PLR email address. (Doc. 23-1 at 73-74.) Although Defendants emphasize that Plaintiff also used other email addresses, their provision of the email address could still be viewed by a reasonable factfinder as tending to support the existence of an employment relationship. *Schupack v. Marketvision Research, Inc.*, 2017 WL 2828687, *2 (E.D. Pa. 2017) (the provision of a "company email address" tends to "support[] [plaintiff's] status as an employee under the factor requiring consideration of which party provided the tools to perform the work"). It is also undisputed that PLR provided Plaintiff with a set of business cards when she started and "waived" the onboarding fee that PLR typically requires new agents to pay. (Doc. 24-3 at 9.)

As for the fourth *Driscoll* factor (whether the service rendered requires a special skill), although Defendants emphasize that Plaintiff was required to hold a real estate license in order to serve as a TC, it is not clear on this record that performing TC services requires a specialized skill—indeed, Plaintiff characterizes the job as largely clerical in nature, despite the licensure requirement. Although Defendants question this characterization in their reply, the Court views this as an undeveloped, disputed issue of fact that cannot be resolved in either side's favor at summary judgment.

As for the fifth *Driscoll* factor (degree of permanence of the working relationship), this marks another instance where the facts may be undisputed but the inferences are not. Although Plaintiff only ended up working as a TC for about three weeks, the offer letter did not set an end date for the relationship and a reasonable factfinder could conclude that the parties intended for relationship to be indefinite in duration. *Compare Donovan*, 656 F.2d at 1372 (explaining that "true independent contractors have a fixed employment period").

Finally, as for the sixth *Driscoll* factor (whether the service rendered is an integral part of the alleged employer's business), although the use of a TC was voluntary for some of PLR's transactions, it was mandatory in the subset of transactions that resulted from leads generated by PLR. The sixth *Driscoll* factor thus presents something of a mixed bag, and it certainly does not support Defendants' position so strongly as to warrant summary judgment in their favor when some of the other factors could be viewed as supporting Plaintiff's position. *Cf. Narayan*, 616 F.3d at 901 ("If we are to have multiple factors, we should also have a trial.") (cleaned up).

Because the Court has denied Defendants' motion for summary judgment, it also rejects Defendants' additional request, raised in a single sentence at the end of their brief, for sanctions under 28 U.S.C. § 1927. And even if Defendants had prevailed on their motion for summary judgment, their conclusory request for sanctions would still fail because they came nowhere close to doing the work needed to justify the "extraordinary remedy" of § 1927 sanctions. *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 437 (9th Cir. 1996) ("[T]he power to sanction under 28 U.S.C. § 1927 . . . is an extraordinary remedy . . . to be exercised with extreme caution."); *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1223 (9th Cir. 2010) ("The district court's authority to sanction attorneys under § 1927 . . . must be exercised with restraint and discretion.").

III. Plaintiff's Motion For Partial Summary Judgment

In moving for partial summary judgment on liability (Doc. 24), Plaintiff essentially raises the same arguments she raised in opposition to Defendants' motion. Likewise, Defendants' response (Doc. 27) essentially raises the same arguments they raised in their affirmative motion.

Just as Defendants are not entitled to summary judgment on the employee/independent contractor issue, neither is Plaintiff. The outcome will ultimately turn on the factfinder's resolution of disputed factual issues and disputed inferences.

…

…

Accordingly,

**IT IS ORDERED** that:

1. Defendants' motion for summary judgment (Doc. 23) is **denied**.

2. Plaintiff's motion for partial summary judgment (Doc. 24) is **denied**.

Dated this 23rd day of August, 2024.

*Dominic W. Lanza*
United States District Judge